Good morning, and I please the court and counsel. My name is Curtis Martin. I'm with the firm of Shaw & Martin here in Burnham. I represent the respondent, appellant Eric Stiegman. This relocation case involves three children of the parties who had resided at the time of trial in the Nashville, Illinois area, and the relocation petition was a request to move the kids to Crestview, Florida, about ten hours away from Nashville, Illinois. Of course, the relocation was governed by Section 609.2 of the Marriage Act, and it's 11 factors that are set out there that the trial court should consider. Of course, this is a case-by-case basis. There's no cookie-cutter situation, but the petitioner, Ms. Reeves, Tessa McCuller, must establish by preponderance of the evidence that the relocation was in the best interest of the children. Now, the trial court's ruling would be reversed if it's against the manifest weight of the evidence. Which exists, of course, only where there's an opposite conclusion that's clearly apparent or the finding of the trial court's unreasonable or arbitrary or not based on the evidence presented. And I've set out those review standards in the Eckert-Fatkin, I think I've pronounced that correctly, in the best cases. This court is not to re-weigh the evidence. I'm not asking for the court to re-weigh the evidence that the trial court considered. And, of course, there's deference that must be given to the trial court's decision. There's a presumption in favor of its findings, but even given those standards, I suggest that the evidence in this case shows that the, or militates against the relocation. Considering the factors, and I won't go through all 11 of them, I promise, but the first couple of factors I want to review here and consider was Tessa's reason for seeking the relocation and Eric, the respondent, his reason to object to the relocation. The facts bore out in the record that Tessa had, about a year after the parties had divorced, had married another man, Mr. Reeves, Mitchell Reeves, in June of 2016. At the time she married him, he was based in England at an Air Force base. Shortly thereafter, he had been based in the Crestview, Florida area. The parties had purchased a home prior to the time that Tessa had filed her petition to relocate, to purchase this home in the Crestview area. And I sort of liken this factor to Tessa's shiny new object. And I don't mean that with disrespect, but the point is that she always seemed to be, in terms of her testimony trial and her, I guess, testimony or conferences with Dr. Cosmicki, who prepared the report, she always seemed to be looking for the next thing that would make her happy. And she admitted that she had not resided with her new husband. By the time of the trial in June of 2019, they had been married about three years. She admitted that she had not resided with him collectively, or I'll take that back, had not resided with him more than 30 days at a time. And collectively, regarding the children, they hadn't been around this new husband for more than 75 days over that three years. How much of the separation was due to his military service, though? How much? I mean, 30 days. The husband was in the military, right? Yes. How much of the separation was as a result of his deployment, or being in other places, filling his military duties? Well, the evidence was that he, after he had been stationed in the Crestview area, that that was his main location. There wasn't any travel associated with that. And I can't, I don't think I can answer your question there, because I don't think the record bore out why it was they didn't spend more than 30 days' time together. I suppose, and I'm supposing, she resided here in Nashville, where the father was, where the children were, where all the extended family were, and would, on extended visits, see him. But other than that, I don't know the answer to that. I don't think it had to do specifically with his military obligations, though. Okay. So they were, they hadn't spent a lot of time together over the three years period of time. Then in the record reflects that in Easter, on Easter in 2017, Tessa brings up that she regretted having married her new husband, that she was exploring this remarriage with her former husband, had even made a statement to her former husband that the child she was carrying with her new husband she wished would be his. And then in August of 2017, she went so far as to file a petition for dissolution of marriage, only to then, about a month later, reconcile with her new husband after she had the child that she was pregnant with. And unbeknownst to my client, engaged in that reconciliation, and then about four or five months later, finally dismissed her petition for dissolution of marriage. That would have been in January of 2018. And Dr. Kosmenty made note of her impulsive personality assessment and some mental health issues associated with that, and even referenced some therapies that she was receiving associated with all of that. Now, I told you all of that to say that the PD case that I cited indicates that it's not about the parent who's petitioning for the relocation. It's about the children and their best interest. So when you view it through that lens of this impulsivity of Tessa and her seeking the next new thing that she believes would make her happy, I suggest that places her own interest over the best interest of the children. Now, turning to the reason that Eric had objected to the relocation, of course, he indicated that would be devastating to his relationship with the children. Now, the trial court had made a characterization about Eric's relationship with the children that this was a matter of inconvenience to him if they would be relocated, and suggested that there was some damning evidence that he had allegedly agreed to her relocation if she backed off of pursuing a child support or rearage. But Eric flatly denied that, said he had never been in agreement with her relocation, no matter what the reason might have been. Flatly denied it. So the inconvenience and the damaging finding that the trial court made, I suggest, is just an unreasonable position for the trial court to take against Eric in light of the detrimental effect it would have on him and his relationship with his children as a result of the move all the way down to Florida. At the very least, these two factors are counterbalancing one another. Now, another factor that I wanted to discuss was the history and the quality of each parent's relationship with the children, and specifically whether one of the other parents substantially failed to exercise the parenting time that they were granted under their allocation agreement or allocation judgment. Now, the trial court found that Eric's relationship with the children was sometimes volatile and sometimes a physical relationship, and that he didn't exercise all the time that he had been allocated. But the record was replete with testimony of both of the parties that they had a cordial relationship with one another regarding the parenting time, that there were often times that they had unscheduled parenting time exchanges, and the trial court also ignored the testimony that Eric gave that wasn't rebutted about his substantial involvement with the kids regarding their extracurricular activities, attendance at games, practices, his participation in those things, his coaching in those things, all of which was a substantial addition of time that he had with the kids over and above what he otherwise had through the structured parenting time schedule. And the trial court seemed to demonize Eric with respect to the child support arrears that I mentioned earlier. In March of 2018, there had been a hearing where Tessa had filed a petition for rule of show cause against him for being behind in child support. The ultimate finding was that he was about $10,000 behind. But the trial court also made note during that March 2018 hearing that Tessa had been complicit in some of this, where she had led Eric to believe that they might reconcile, that they might remarry, and the trial court's words had turned Eric every which way but loose. Nevertheless, the court said, you know, I've got a standard to meet here of whether he was willful in not paying the child support, found him behind in the $10,000, sentenced him to six months in jail, but allowed him to purge that by paying the child support, which he did and has been since March of 2018, paying $1,000 per month, which was $600 for the regular payment and $400 toward the arrears. Since March of 2018, at least up until the time of trial in June of 2019, he never missed a payment. And I referenced that recitation of the court's finding in March of 2018 juxtaposed to its findings in June of 2019, and I suggest that it's just an unreasonable and unjust application towards Eric to sort of demonize him for being behind in child support and suggest that that has some sort of impact on his relationship with the children when there were substantial extenuating circumstances behind that. And once he's found to be in arrears, he's been paying as ordered consistently since that time. Now, the strongest factor I suggest that militates against the allowing of the relocation is the presence or the absence of extended family in the original residence for the children versus where they were sought to be relocated. The evidence was clear that there was no, none, no extended family in Florida whatsoever. But in contrast, in the Nashville area, there, of course, was Father Eric. There was his mother, his stepfather, his grandmother, his sister, and her two children that were close in age to the party's three children. There was Tess's two parents, her aunt, her three siblings, and their collective six children who were also close in age to the party's children. Also Tess's cousin, her two children, and even Mitchell, her new husband's extended family was in the Nashville area. And as I counted this up, it was over 20 different people, extended family. And these weren't just family members they saw on an occasional holiday. These were people that the children interacted with. And, in fact, Dr. Kosmicki had made note that Cole, the middle child, was extremely upset about the possibility of being relocated because he had a very close relationship with one of his cousins close in his age. I think the cousin's name was Brinkley. The court made a finding that he thought that the extended family was abnormal because of Tess's father's alleged controlling behavior. But it was strange to me, as read through the record, that she kept returning to her parents' home claiming that it was because of financial need. But when you look at the facts here, it just doesn't add up because she herself was employed as a teacher, I believe it was, at $30,000 a year. She had non-taxable income of $12,000 a year from the child support consistently that Eric had been paying since March of 2018. And she also testified she had access to her new husband's income through a joint account, and her husband's income was $75,000 to $80,000 a year. So you have to look at what Tess did, not what she said here, in terms of claiming that she had this very poor relationship with her father in particular and even extended it to her siblings. Counsel, was there some issue regarding maybe the relationship of your client's mom and maybe your client or how that somehow affected the kids? There was some testimony about my client who had lived with his mother for a period of time because he had some financial difficulties, some job search issues. And there was some conflict alluded to between my client and his mother. But by the time of the trial, my client hadn't been living with his mother. He was living on his own at a place established for the children for about three or four months. So that issue wasn't really a prominent issue as of the time of the trial. But, yes, there was some testimony about that. But that was only as to his mother. There were all the other extended members of the family, including all of the cousins who were close in age with the children, who they had also, as I said, not just seen at holidays, but they had interaction with through extracurricular activities. And, as I said, Cole, the little child, was very close to one of the cousins and was very expressive about his being upset about the possibility of not being able to have that relationship with him anymore if he were to move to Florida. And I stop here with regard to Tessa making a great deal of emphasis on her strained relationship with her family. You know, some time ago, my father had a conversation with my little sister who was complaining about some difficult relationships she had with some people. And my father just stopped and said, You know, honey, did you ever think that this strained relationship that you have with these number of people, is it possible that it could be you and not them? And I think that's applicable here. So, okay. I just wanted to conclude that this is the strongest factor that militates against the relocation because of the extended family and none in Florida. And the manifest way of the evidence here is that it is not in the best interest for the children to be moved to Florida. And the trial court's decision in that regard should be the case. Thank you, counsel. Thank you. I have one question. Yes, sir. How important is it for a child to be able to rely on a parent to fulfill their scheduled visitation? I mean, it's okay to have a parent who, at their discretion, has maybe even a significant involvement in a child's life and activities. But a scheduled visitation where the child has a right to expect that the parent is going to comply and be there and the parent does not. Can you see any dichotomy here? Well, to answer your question, I think to answer your question, yes, I think it's very important that the child be able to rely upon the parent in a consistent schedule. If they are old enough to know and understand and anticipate, the next time they might see that other parent, I think it's very important they be able to rely on that and that the parent follow through on that. Yes. Thank you. Thank you, counsel. May it please the Court. I'm Rebecca Reiner here on behalf of the appellee, Tessa Reeves, and the mother in this relocation matter. The starting place in all appellate court considerations is the standard of review. Father's assertion regarding the applicable standard of review in this matter is incorrect. The standard of review for relocation and in determining the best interest of the children is whether or not the trial court's decision was so clearly against the manifest weight of the evidence that a manifest injustice has occurred. This is a greater deferential standard of review than the simple manifest weight of the evidence. It is not a distinction without a difference, as father's reply brief would have this court to believe. While father's reply brief points to the case of best v. best, best is an order of protection case, it is not a best interest or relocation case. One cannot ignore that the Supreme Court in fact can, at paragraph 32, which is a relocation case, includes additional language of clearly and a resulting manifest injustice. This language leads to a presumption in favor of the trial court's results. This presumption is always strong and compelling in relocation cases. Father's brief fails to apply the standard of review. It wholly ignores it. While he asserts the standard of review is the less deferential standard of review, he fails to even apply it to the record. What father has done is point to the record and ask for this court to reweigh the evidence. This is exactly what the Supreme Court in fact has directed the appellate court not to do. An appellate court cannot simply reweigh the evidence. Father fails to point to any evidence in the record which results in a manifest injustice occurring and which overcomes the presumption of the trial court's decision being incorrect. The trial court's opinion is very detailed and it goes through each and every statutory factor and cites to the evidence upon which this decision is based. There is nothing in the record which father has pointed to which overcomes the strong and compelling presumption in favor of this decision. While Mr. Martin presented to the court that mother's desire to relocate was on a whim or on a search for what's better for her, there's no contradictory evidence in the record as to Dr. Kosnicki's evaluation and finding. There's nothing presented by father or that he can point to in the record for the recommendation and finding of the evaluator. And while the evaluation is not binding on the trial court, it is something that the trial court can consider and is a reasonable consideration. Furthermore, while Mr. Martin asserts that there is no family in Florida, there clearly is not, that's undisputed, there's also a finding of the trial court that there were glaring, abnormal, extended family circumstances in this case. Father presented no testimony and there's no evidence in the record to contradict that. The mere presence of family in the Nashville area does not anchor the children to Illinois. I think Dr. Kosnicki's evaluation does a very good job of explaining that a lot of that may be pressure of father. Cole actually reiterated, almost verbatim, dad's concerns regarding the relocation, that it was removing him from everything that he knew in Nashville. And that's one child, he's a nine-year-old child, Your Honor. And despite that, we have an individual with a Ph.D., the court-appointed expert, who says it's in Cole's best interest for him to relocate. That in and of itself, that one child's expression to stay in the state of Illinois, doesn't mean that the trial court's decision was clearly against the manifest weight of the evidence. There's a strong and compelling presumption that the decision ultimately to allow mother to relocate is in the best interest of the children. How old were the other children? Claire was ten at the time of trial, and Cortland, the little boy, was six years old. And Claire, Your Honor, actually indicated that she wanted to get away from the chaos and the drama of the extended family. Not only mother's extended family, I believe one of Your Honors asked regarding father's mother. Father admitted at the time of trial that his mother had an ongoing drinking problem, and the children probably shouldn't be left alone with the children. So this is an extended family. Dr. Kosmicki's report that mother had testified that she agreed with the factual interpretation or the facts set forth therein is that her own extended family no longer speaks to her. So she has siblings, aunts and uncles of the minor children, for which there's not been any contact in excess of a year. Those are the cousins that Cole is referring to that he's close with. So those cousins, he doesn't see frequently on mother's side, and the record reflects that, Your Honor. So I would just reiterate that the standard of review is of great deference to the findings of the trial court, that there is a presumption in favor of the trial court's decision, and we would request that the appellate court affirm the trial court's decision. Your Honors, I have to confess my ignorance. I don't understand the counsel's argument about a different standard of review here. I've recited the Supreme Court case of Facton. I've recited the Supreme Court case of Eckert and the Supreme Court case of Best, all associated with the manifest way of the evidence and what that consists of. I think I've accurately set that forth in the brief and in the reply brief. And we're not seeking to have this court reweigh the evidence, but I certainly needed to recite the evidence. In fact, I ran out of time in pointing out certain factual issues that have brought to the court's attention on my original argument, and I've set the rest of those out in my brief for the court's consideration. With regard to Dr. Kosmicki's evaluation and the search that Tessa seemed to engage in to find the next thing that was going to make her happy, I think he reiterated that it was impulsive behavior on her part in her search to try to find something that would make her happy, and that she was complicit in the relationships that she now found had been soured, especially as it relates to her siblings, but it doesn't mean that that's the sour relationship for the children, because the children specifically did have interaction with their multiple numbers of cousins. They were involved in extracurricular activities together. All of them were very close in age, and as you mentioned, Cole expressly indicated he very much didn't want to move. He had a very close relationship with one of his cousins, Brentley, and I think that is illustrative of the impact that it would have on the children. So it's not a matter of what would make Tessa happier, but rather what is in the best interest of the children, and that's the standard here, and we suggest that the trial court's decision was against the manifest way to the evidence, and it wasn't in the best interest of the children, and it should be reversed.